**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| **JOHN DOE** | \| |
| | \| |
| **Plaintiff,** | \| |
| | \|     **CIVIL ACTION NO. 17-cv-2500** |
| v. | \| |
| | \| |
| **TEXAS A&M UNIVERSITY,** | \|     **COMPLAINT** |
| **DAYNA FORD**, as agent for Texas A&M | \|     **AND** |
| University, **ROBIN SHUGLIE**, as agent | \|     **JURY TRIAL DEMAND** |
| for Texas A&M University, **GLENN STARNES**, | \| |
| as agent for Texas A&M University, **MIKE** | \| |
| **DULKE**, as agent for Texas A&M University, | \| |
| **KYLE MCCRACKEN**, as agent for Texas A&M | \| |
| University, **TERRI ALLISON**, as agent for | \| |
| Texas A&M University, **JOSHUA** | \| |
| **ISRINGHAUSEN**, as agent for Texas A&M | \| |
| University, and **DALE NORRIS**, as agent for | \| |
| Texas A&M University, and **ANNE REBER**, as | \| |
| Agent for Texas A&M University, | \| |
| | \| |
| **Defendants.** | \| |

## COMPLAINT

Plaintiff John Doe[1], by his attorneys Nesenoff & Miltenberg, LLP and Hunt & Tuegel, PLLC, as and for his Complaint against Defendants Texas A&M University, Dayna Ford, Robin Shuglie, Glenn Starnes, Mike Dulke, Kyle McCracken, Terri Allison, Joshua Isringhausen, Dale Norris, and Anne Reber (collectively, "Defendants"), alleges as follows:

## THE NATURE OF THIS ACTION

1.      This action based on constitutional due process, Title IX reverse discrimination and related state law is brought on behalf of Plaintiff John Doe ("Plaintiff" or "John Doe"), a now expelled, former student at Defendant Texas A&M University ("TAMU" or the "University").

---

[1] Plaintiff herewith files a motion to proceed pseudonymously.

1

2.      Facing potential negative publicity and an Office of Civil Rights ("OCR") investigation, TAMU have denied male students their rights to fair process in the investigation and adjudication of sexual misconduct complaints.  In 2015, the OCR opened an investigation at TAMU into the disciplinary process and procedures in place in the University. In 2016, the OCR announced it had opened an investigation into fellow Texas educational institution Baylor University's handling of Title IX cases, which soon became a public scandal.

3.      Against this backdrop, TAMU treated John Doe in a manner inconsistent with TAMU's policies and procedures, stripping him of his rights to a fair and just investigation and adjudication process.  After receiving a report from a female student, Jane Doe,[2] concerning sexual contact she had with John Doe approximately one year earlier, TAMU failed to conduct an adequate, reliable, and impartial investigation and hearing. Upon being notified of John Doe's hospitalization and subsequent admittance to a mental health treatment facility, TAMU proceeded with the investigation and adjudication process without John Doe's participation altogether, depriving John Doe of his right to defend himself against false allegations. TAMU reached the erroneous conclusion that John Doe had engaged in misconduct, despite a lack of evidence or witness testimony to support Jane Doe's claims.

4.      TAMU indicated a bias towards male students when it investigated and adjudicated allegations against John Doe in a manner and degree materially different than their investigation and adjudications of allegations made against Jane Doe by a male student. While John Doe was removed from campus housing and his extracurricular activities during the course of the disciplinary process, Jane Doe was able to remain in her dormitory and activities while claims against her were being investigated and adjudicated. While John Doe was found "Responsible" of all four charges against him, without a basis, rationale, evidentiary support, or

---

[2]  This individual's name has been changed to a pseudonym to protect her identity.

2

the opportunity to defend himself, TAMU assigned Jane Doe and her accuser "50/50 responsibility," and Jane Doe received no sanctions.

5.     In erroneously deciding that John Doe engaged in sexual misconduct in violation of TAMU's Title IX policy, the adjudicator relied on prejudicial assumptions and failed to apply the requisite preponderance of evidence standard required by both the University's own policies and Title IX.  At all times, John Doe was deemed guilty. Consequently, John Doe was suspended for over one full year and dismissed from the University's Corps of Cadet.  This extreme and severe sanction was not warranted in light of the lack of evidence.

6.     Defendant TAMU conducted a procedurally flawed investigation and adjudication process leading to an erroneous outcome and an unduly severe, disproportionate sanction resulting from anti-male discriminatory bias in violation of Title IX.

**THE PARTIES**

7.     John Doe is a natural person residing in the State of Texas.  During the events described herein, John Doe was a student at TAMU.  John Doe resided in College Station, Texas from 2013 to 2017.  John Doe's parents also reside in the State of Texas.

8.     Defendant Texas A&M University ("TAMU" or the "University") is a public university located in College Station, Texas.  It is the recipient of state and federal grants and contracts.

9.     Upon information and belief, Defendant Dayna Ford is a resident of the State of Texas and was the Assistant Director for the Division of Student Affairs at TAMU at all relevant times herein.

10.     Upon information and belief, Defendant Robin Shuglie is a resident of the State of Texas and was the Title IX Investigator at TAMU at all relevant times herein.

3

11.     Upon information and belief, Defendant Glenn Starnes is a resident of the State of Texas and was the Assistant Commandant of Operations & Training at TAMU at all relevant times herein.

12.     Upon information and belief, Defendant Mike Dulke is a resident of the State of Texas and was a Representative of the Office of the Commandant at TAMU at all relevant times herein.

13.     Upon information and belief, Defendant Kyle McCracken is a resident of the State of Texas and was the Coordinator of Resident Life II at TAMU at all relevant times herein.

14.     Upon information and belief, Defendant Terri Allison is a resident of the State of Texas and the Case Manager of the Aggie Honor System Office at TAMU at all relevant times herein.

15.     Upon information and belief, Defendant Joshua Isringhausen is a resident of the State of Texas and was the Assistant Coordinator of the Student Conduct Office at TAMU at all relevant times herein.

16.     Upon information and belief, Defendant Dale Norris is a resident of the State of Texas and was the Cadet Training Officer III at the Office of the Commandant at TAMU at all relevant times herein.

17.     Upon information and belief, Defendant Anne Reber is a resident of the State of Texas and was the Dean of Student Life at TAMU at all relevant times herein.

## JURISDICTION AND VENUE

18.     This Court has federal and supplemental jurisdiction pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1343 and 28 U.S.C. § 1367 because: (i) the case arises under the laws of the United States; (ii) the claims brought under Title IX of the Educational Amendments of 1972, 20

4

U.S.C. § 1681 et seq., and 42 U.S.C. § 1983 are civil rights claims; and (iii) the state law claims are so closely related to the Title IX and 42 U.S.C. § 1983 federal law claims as to form the same case or controversy under Article III of the U.S. Constitution

19.     This Court has personal jurisdiction over Defendants on the grounds that Defendants are conducting business at Defendant TAMU and within the State of Texas.

20.     Venue for this action properly lies in this district pursuant to 28 U.S.C. §1391 because the events or omissions giving rise to the claim occurred in this judicial district.

## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

A.     **Background: The "April 2011 Dear Colleague Letter"**
       **Of The Department of Education's Office for Civil Rights.**

21.     On April 4, 2011, the OCR sent a "Dear Colleague Letter" to colleges and universities (hereinafter referred to as the "April 2011 Dear Colleague Letter"). The "April 2011 Dear Colleague Letter" provides a necessary set of background facts to this action.

22.     The "April 2011 Dear Colleague Letter" advised that, in order to comply with Title IX, colleges and universities must have prompt procedures to investigate and resolve complaints of sexual misconduct. Most notably, the "April 2011 Dear Colleague Letter" required schools to adopt a relatively low burden of proof—"more likely than not"—in cases involving sexual misconduct, including sexual assault. Several colleges had previously been using a "clear and convincing" standard of proof, and some, like Stanford University, applied the criminal standard, "beyond a reasonable doubt."

23.     The "April 2011 Dear Colleague Letter" states that schools should "minimize the burden on the complainant," transferring alleged perpetrators, if necessary, away from shared courses or housing. The "April 2011 Dear Colleague Letter," while not completely ignoring due process concerns, suggested that schools focus more on victim advocacy. The "April 2011 Dear

Colleague Letter" states that schools should give both parties the right to appeal a decision, which amounts to double jeopardy for an accused student. After the "April 2011 Dear Colleague Letter" was published, many schools changed their sexual assault and sexual harassment policies and procedures.

24.     The Obama Administration, through the DOE and OCR, treated the 2011 Dear Colleague Letter as binding on regulated parties for all practical purposes and pressured colleges and universities to aggressively pursue investigations of sexual assaults on campuses. Catherine Lhamon ("Lhamon"), former Assistant Secretary of the Department of Education ("DOE") in charge of its Office for Civil Rights ("OCR"), delivered the following marching orders to colleges and universities:

(a)     In February 2014, Lhamon told college officials attending a conference at the University of Virginia that schools needed to make "radical" changes. According to the Chronicle of Higher Education, college presidents said afterward that there were "crisp marching orders from Washington." "Colleges Are Reminded of Federal Eye on Handling of Sexual-Assault Cases," Chronicle of Higher Education, February 11, 2014.

(b)     In June 2014, Lhamon testified at a Senate Hearing that "some schools are still failing their students by responding inadequately to sexual assaults on campus. For those schools, my office and this Administration have made it clear that the time for delay is over." Lhamon stated at the Senate Hearing in June 2014 that "we do" expect institutions to comply with the 2011 Dear Colleague Letter.  Lhamon further told the Senate Committee, "Th[e] [Obama] Administration is committed to using all its tools to ensure that all schools comply with Title IX . . ." She also told the

Committee: If OCR cannot secure voluntary compliance from the recipient, OCR may initiate an administrative action to terminate and/or refuse to grant federal funds or refer the case to the DOJ to file a lawsuit against the school. Lhamon additionally stood behind the "April 2011 Dear Colleague Letter."

(c)  In July 2014, Lhamon, speaking at a conference on campus sexual assault held at Dartmouth College, stated that she was prepared to cut off federal funding to schools that violate Title IX and that she would strip federal funding from any college found to be non-compliant with the requirements of the Dear Colleague Letter. "Do not think it's an empty threat," Lhamon warned. She went on to describe that enforcement mechanism as part of a set of "very, very effective tools," adding, "If a school refuses to comply with Title IX in any respect, I will enforce." Lhamon was quoted: "It's not surprising to me that we haven't gone to the last step. . . . It means that so far the process has been working." Meredith Clark, "Official to colleges: Fix sexual assault or lose funding," July 15, 2014 (available at: http://www.msnbc.com/msnbc/campus-sexual-assaultconference-dartmouth-college#51832).

(d)  Lhamon was quoted in the *Los Angeles Times* stating, "We don't treat rape and sexual assault as seriously as we should, . . . [There is] a need to push the country forward." Savage and Timothy M. Phelps, "How a little-known education office has forced far-reaching changes to campus sex assault investigations," *Los Angeles Times*, August 17, 2015.

25.  To support making the "April 2011 Dear Colleague Letter" binding, the OCR hired hundreds of more investigators for Title IX enforcement. As of Feb. 1, 2017, the Federal

Government has 306 open investigations at institutions of higher education, including Defendant TAMU. The Department of Education has negotiated settlements with many schools, including Ohio State University.

26.     In March 2015, the OCR opened an investigation into how TAMU handled allegations of sexual violence on its campuses. The investigation commenced after a graduate student, who had been accused of sexual assault, found responsible, and suspended by the institution, objected to what he saw as a "flawed" system. Upon information and belief, in April 2015, the OCR asked TAMU to respond to allegations that it showed bias against men during its disciplinary proceedings. At the time the OCR investigation was announced, TAMU reportedly defended the suspension, saying it was "based on careful consideration of the testimony of the parties and relevant witnesses and a review of written evidence." https://www.texastribune.org/2015/11/17/department-education-investigating-texas-schools/ The OCR investigation at TAMU remains ongoing.

27.     The colleges and universities under OCR investigation, including Defendant TAMU, are fearful of being sanctioned by the DOE and/or of potential Title IX lawsuits by the U.S. Department of Justice ("DOJ"). In April 2014, the White House issued a report entitled "Not Alone," which included a warning that if the OCR finds that a Title IX violation has occurred, the "school risks losing federal funds" and that the DOJ shares authority with OCR for enforcing Title IX and may initiate an investigation or compliance review of schools. The Report further warns that if a voluntary resolution cannot be reached, the DOJ may initiate litigation. In July 2016, former Vice President Joe Biden suggested that schools that do not comply with administration guidelines could be stripped of federal funding. "Obama, Biden

Won't Visit Universities That Fall Short In Addressing Sexual Assault," Huffington Post, July 4, 2016 ("The vice president said he'd like to take away federal funding from those universities.")

28.     To revoke federal funds—the ultimate penalty—is a powerful tool because institutions receive billions of dollars a year from the federal government.  Anne Neal of the American Council of Trustees and Alumni was quoted as follows: "There is a certain hysteria in the air on this topic, . . . It's really a surreal situation, I think." She explained that "schools are running so scared of violating the civil rights of alleged victims that they end up violating the due process rights of defendants instead."  "How Campus Sexual Assaults Came To Command New Attention," NPR, August 12, 2014.

29.     The DOE and OCR have created a significant amount of pressure on colleges and universities to treat all those accused of sexual misconduct with a presumption of guilt. The Chronicle of Higher Education noted that "Colleges face increasing pressure from survivors and the federal government to improve the campus climate."  "Presumed Guilty: College men accused of rape say the scales are tipped against them," Chronicle of Higher Education, September 1, 2014. In the same article, the Chronicle noted that different standards were applied to men and women: "Under current interpretations of colleges' legal responsibilities, if a female student alleges sexual assault by a male student after heavy drinking, he may be suspended or expelled, even if she appeared to be a willing participant and never said no. That is because in heterosexual cases, colleges typically see the male student as the one physically able to initiate sex, and therefore responsible for gaining the woman's consent." "Presumed Guilty: College men accused of rape say the scales are tipped against them," Chronicle of Higher Education, September 1, 2014.  Robert Dana, Dean of Students at the University of Maine, told NPR that some rush to judgment is inevitable. "I expect that that can't help but be true," he says. "Colleges

9

and universities are getting very jittery about it." "Some Accused Of Sexual Assault On Campus Say System Works Against Them," NPR, September 3, 2014. g.

30.     In May 20016, the National Association of College and University Attorneys published a research note urging colleges and universities to "promptly destroy" documents such as "emails … staff notes … notes of hearing participants during a disciplinary hearing, drafts of hearing outcome reports, and other such working papers," all of which "might actually prove very useful to a plaintiff's lawyer" in a subsequent lawsuit and could contradict or undermine the single record the institution retains. http://counsel.cua.edu/res/docs/titleixlitigation.pdf

31.     On October 19, 2016, the OCR announced it had opened an investigation into fellow Texas educational institution Baylor University's handling of Title IX cases. The investigation had been reported to be prompted by a complaint filed on September 26, 2016 by Baylor's former Title IX coordinator, who resigned a week later amid allegations she had made that senior leaders at Baylor prevented her from properly investigating Title IX cases. The OCR investigation and resignation of Baylor's Title IX coordinator came over a year after students began accusing Baylor of mishandling cases of alleged sexual assault. (See https://www.nytimes.com/2016/10/20/sports/ncaafootball/baylor-federal-investigation-title-ix-violations.html; http://www.cbsnews.com/news/baylor-university-sexual-assault-scandal-title-ix-coordinator-patty-crawford-resigns/).

32.     When the Baylor University scandal broke, media outlets pointed to the fact that the U.S. Department of Education ("DOE") has the ability to terminate federal funds, and that although Baylor is private school, it receives federal funding via student federal financial aid for tuition.    (See    http://www.espn.com/college-football/story/_/id/17836024/us-department-education-launch-baylor-probe-title-ix-complaint)

33.     Upon information and belief, the Baylor University scandal created a chilling effect among other universities, particularly nearby schools within the state of Texas, like TAMU. TAMU, therefore, was reasonably aware that the situation at Baylor had shined a light on other schools for their handling of sexual assault cases and had the potential to produce negative publicity for TAMU.

34.     In response to pressure from OCR, DOJ, and the Obama Administration, educational institutions, like Defendant TAMU —which also faced negative publicity in the wake of the Baylor investigation—have limited the procedural protections afforded to male students, like John Doe, in sexual misconduct cases.

B.  **John Doe And Jane Doe Become Friends And Begin To Engage In Sexual Activity**

35.     John Doe was born in Akron Ohio, later moving to and living in Chicago Illinois and Richmond, Virginia during his grade school years. He was raised in a loving religious family, and attended a Christian middle school. During his youth, he was involved in a service organization through his church, which was the faith-based equivalent of the Boy Scouts.

36.     John Doe's family eventually settled in Texas, and during his high school years, John Doe further excelled in his academics and extracurricular activities. He was heavily involved in his school's marching band, winning third place in the state marching band competition his junior year. He also held a number of leadership positions and won many awards. He was a member of the Student Council, served as the head of Public Relations, was a leader in and given an award by RYLA (Rotary Youth Leadership Award), attended and awarded with recognitions by the Southwest Youth Leadership Conference at Trinity University, received Salutes award from the North Texas Council on Youth Leadership for high scholastic achievements, was the Youth Representative at his Church Council, and was voted by his peers

11

to be the Band President during his senior year.   He graduated high school with a 4.58 GPA and in the top 9% of his graduating class. His childhood goal had been to become a lawyer and later become the first African American President of the United States of America.

37.     Although John Doe was accepted to all nine universities that he applied to, he decided that TAMU was where he wanted to spend the next four years of his life. Upon enrolling in TAMU, John Doe was directed to the Texas A&M University Student Rules (the "Policy"), which outlined academic rules, student life rules, and student grievance procedures for all TAMU students.

38.     At TAMU, John Doe thrived, joining the Corps of Cadets, as well as the University's marching band, the "Fightin' Texas Aggie Band" (the "Aggie Band"). He also joined the Aggie Orientation Leader Program (AOLP), which plans, coordinates, and runs the New Student Conferences that all students are required to attend before their freshman year. After a year as an Orientation Leader, John Doe applied and was chosen to be an Orientation Leader Mentor. He also worked for the George H.W. Bush Foundation.

39.     John Doe and Jane Doe met as First Year Students at TAMU in August 2013. They were both in the Aggie Band, and forged a casual friendship in the Fall Semester of 2013. Both were also members of the Corps of Cadet and were later part of a small group of friends who would meet to play the role-playing game "Dungeons and Dragons." Over the next few years, John Doe and Jane Doe grew to be close friends.

40.     On or about January 15, 2016, John Doe and Jane Doe both attended a party at the apartment of fellow TAMU student, "W.L.", but arrived separately. John Doe had consumed alcohol but was not intoxicated. Jane Doe, to John Doe's knowledge, had not consumed alcohol that evening.

12

41.     At one point during the party, John Doe went outside to take trash to the dumpster. Jane Doe followed him and offered to help him take out the trash. Once the trash was thrown away, Jane Doe made advances on John Doe and initiated a kiss, at which point Jane Doe and John Doe began to make out. John Doe then suggested they go back inside because their friends would be waiting for them. Jane Doe, however, suggested they go into her parked car to continue making out. Jane Doe informed John Doe that she did not want to engage in sexual intercourse, but was interested in engaging in other sexual activity with him. John Doe and Jane Doe then removed their own clothing and assisted each other in removing each other's clothing. John Doe and Jane Doe then proceeded to kiss and touch each other's bodies. During this time, Jane Doe made positive sexual sounds, indicating pleasure, and reciprocated the physical touching. John Doe performed oral sex on Jane Doe, during which time she continued making positive sexual sounds. John Doe asked Jane Doe if she would like to perform oral sex on John Doe, to which Jane Doe verbally responded in the affirmative. Jane Doe then proceeded to perform oral sex on John Doe in the car. John Doe and Jane Doe did not engage in sexual intercourse.

42.     After John Doe and Jane Doe concluded their sexual activity, they exited Jane Doe's vehicle and returned to the party.

43.     Later that evening, John Doe and Jane Doe left the party again to throw out trash. They then mutually agreed to enter John Doe's car and engaged in consensual sexual activity once again. John Doe and Jane Doe removed their own clothing and assisted each other in the removal of clothing. Jane Doe initiated the encounter, kissing John Doe first. John Doe and Jane Doe then proceeded to touch each other's bodies, including each other's genital areas. Again,

Jane Doe indicated pleasure through positive sexual sounds. John Doe and Jane Doe did not engage in sexual intercourse.

44.     When John Doe and Jane Doe concluded their sexual activity, they talked about how they had been away from the house where their friends were gathered for long enough that people would start to notice.

45.     While back at the party, John Doe and Jane Doe entered a friend's vacant bedroom together. John Doe and Jane Doe mutually initiated and engaged in sexual activity in a bed, during which time they performed oral sex on one another and rubbed their bodies against each other without vaginal or anal penetration.

46.     The next day, on January 16, 2016, John Doe and Jane Doe engaged in friendly conversation. They did not discuss the sexual contact they shared the previous night. For several months thereafter, John Doe and Jane Doe continued their friendship without sexual contact.

47.     Several days later, on January 22, 2016, Jane Doe messaged John Doe to see if he wanted to see a movie with her. When he did not respond right away, but apologized later that he didn't see the message for an extended period of time, Jane Doe responded "I was a little upset that you didn't say anything…" She also insisted that they have to be more diligent in making plans together.

48.     John Doe and Jane Doe spent the next few months communicating often through "Group Me," a messaging application. During these conversations, Jane Doe opened up to John Doe and told him that she reacts to social situations differently than most people and that she justifies her reactions because of her personal views, which she refers to as "unorthodox perspectives." She told John Doe that people disapproved of her "fooling around" with "so many people" and that she would continue to "fool around" with their friends. She expressed to John

14

Doe that he is one of her best friends. Jane Doe also asked John Doe if it is ok for her to manipulate people through seduction.

49.     John Doe also opened up to Jane Doe, telling her about his experiences with depression. John Doe and Jane Doe continued to frequently communicate with one another, often talking about their relationships with other people and giving each other dating advice. They would also frequently hang out in person.

50.     John Doe and Jane Doe continued to become closer friends throughout the Spring 2016 semester. Jane Doe often asked John Doe to accompany her on errands. On or about April 1, 2016, Jane Doe entered John Doe's room in order to cuddle with him. On or about April 6, 2016, John Doe and Jane Doe discussed that neither of them was interested in an actual relationship.

51.     On or about April 9, 2016, John Doe informed Jane Doe that his room was empty. In response, Jane Doe suggested she could come over. Inside John Doe's room, the two removed their own and each other's clothing and mutually initiated and engaged in sexual activity, which included kissing, touching, oral sex, and vaginal intercourse. During that encounter, mutual consent was given through positive sexual sounds as well as verbally when deciding on new sexual positions. Jane Doe asked John Doe to use a condom, which he agreed to do. Jane Doe did not withdraw consent or ask John Doe to stop at any point. John Doe had consumed alcohol that evening but Jane Doe had not. After the sexual contact concluded, Jane Doe stayed in John Doe's bed for some time, before returning to her own room.

52.     After the evening of April 9, 2016, John Doe and Jane Doe continued to communicate often. On April 12, 2016, they discuss sexual fetishes and what attracts each of them to certain people. Jane Doe, unprovoked, began explaining her "sex class" and the anatomy

of the penis. Their communications continued to be friendly and flirtatious. At times, they would discuss the possibility of sending nude photographs to each other.

53.     Approximately one week later, Jane Doe informed John Doe that her roommate was out of town. In response, John Doe said that he could come keep her company. Jane Doe responded "you should do that." John Doe then went to Jane Doe's dorm room and they proceeded to engage in consensual sexual activity. John Doe and Jane Doe remained friends afterwards. On April 29, 2016, Jane Doe asked John Doe to go get food with her.

54.     On or about May 10, 2016, Jane Doe messaged John Doe to tell him that she wished he could see her Wonder Woman "panties" because "they're soft" and that he would have to wait to see them for himself.

55.     On that same evening, Jane Doe invited John Doe to her room. John Doe had been drinking earlier that evening. Upon information and belief, Jane Doe had not consumed alcohol that evening. After John Doe entered Jane Doe's room, they removed their own and each other's clothing and mutually initiated and engaged in sexual activity, which included kissing, touching, oral sex, and vaginal intercourse. Jane Doe did not ask John Doe to use a condom and he did not wear one. Consent was indicated by both parties through positive sexual sounds and mutual touching. No force was used by either party.

56.     After that evening, John Doe and Jane Doe continued their friendly conversations and close relationship. On June 8, 2016, Jane Doe asked John Doe for his advice because she "fooled around with" (engaged in sexual activity) with their friend and fellow TAMU student, "R.P." One day later, Jane Doe once again brought up the topic of her Wonder Woman underwear, sending John Doe unprovoked and uninvited photos of herself wearing the underwear, through the photo-sharing application "Snapchat."  She then proceeded to tell John

16

Doe that she was finding it difficult to finish a six-pack of beer and that she was so drunk that she was spilling beer down her shirt. At no point did John Doe invite himself over to her room or attempt to hang out while she was in such a state.

57.     On or about June 16, 2016, Jane Doe and John Doe attended a get-together at a mutual friend's off-campus apartment. John Doe, Jane Doe, and several of their friends consumed alcohol that evening at the apartment, but no one was intoxicated. Witness R.P. and another witness who is not a student at TAMU were both present and saw that Jane Doe did not consume much alcohol. At some point in the evening, John Doe and Jane Doe went into John Doe's room and proceeded to engaged in consensual sexual intercourse. Afterwards, John Doe left for approximately one hour to visit some friends in another apartment in the apartment complex. Upon returning to his room, John Doe and Jane Doe engaged in consensual sexual intercourse once again. The consent was indicated both verbally and non-verbally. Jane Doe did not withdraw consent or ask John Doe to stop and was awake before and during both encounters of sexual intercourse. Once again, Jane Doe did not ask John Doe to use a condom.

58.     Several weeks later, on or about July 1, 2016, Jane Doe became angry with John Doe for telling her not to go to their friend's wedding because she was not invited. Jane Doe had joked to other people that she would "crash" the wedding. Jane Doe told John Doe "I don't want you taking care of me. Ever." John Doe apologized to Jane Doe and told her he did not realize she had been joking, but explained to Jane Doe that he told her not to crash the wedding so she would avoid embarrassment and being turned away from the event.

59.     After their argument, John Doe and Jane Doe were less close with each other and ceased their sexual activity with one another. They continued, however, to carry on a casual friendship. John Doe did not make much of an effort to talk to Jane Doe or respond to her

17

messages, but they would speak periodically and see each other through Corps of Cadet and the band. When they saw each other, they spoke cordially and casually. Jane Doe asked John Doe if she could be his designated driver whenever he was drinking and needed a ride. She also offered to lend John Doe her comic books.  She continuously and frequently initiated conversation with John Doe until she informed him that he should get tested for HPV in October 2016. On or about November 4, 2016, she ran into John Doe and his family at TAMU's "Ring Day," a special ceremony wherein students that have met their academic credit hour and student commitments receive an "Aggie Ring." Jane Doe engaged in a lengthy and very friendly conversation with John Doe and his family.

### C. John Doe Receives A No-Contact Order And Is Later Informed Of Jane Doe's Allegations Against Him

60.     On February 14, 2017, John Doe received a no-contact letter through email from the University, informing him that he is "restricted from making in-person, telephone, or any form of electronic contact" with Jane Doe. The restriction included appearing at a location where he would know or reasonable should have known that Jane Doe would be present.

61.     As John Doe and Jane Doe were part of many of the same activities and organizations, this meant that John Doe would have to remove himself from practically all extra-curricular activities the last few months prior to graduation.

62.     Along with the no-contact letter, John Doe received an email of instructions and restrictions from Colonel Glenn Starnes, Assistant Commandant of Operations & Training at TAMU. The email informed John Doe that he was temporarily suspended of his duties in C-Battery (the Corps of Cadet unit to which John Doe was assigned), barred from participating in all Aggie Band activities, temporarily assigned to Corps Staff, and relocated to a different

dormitory building. John Doe was directed to move his belongings and return his old dorm room key within 48 hours.

63.     Colonel Starnes' email noted that such a list of directives and instructions is "an administrative action typical for your situation" and does not "presume guilt." However, no investigation had commenced, nor had John Doe yet been interviewed.

64.     Distressingly, Colonel Starnes had carbon copied twelve other people on the email he sent to John Doe, publicizing his suspension to fellow Corps of Cadet members, teachers, Corps of Cadet ranking officials, and student workers involved in dorm housing units. Furthermore, two fellow students who John Doe was acquainted with, G.C. and J.T., were contacted and informed about the no-contact order issued against John Doe and the fact that John Doe was under investigation.

65.     John Doe called the Office of Student Conduct to report that his FERPA rights may have been breached by the divulgence of private information regarding the investigation, but was told that the Corps of Cadet handles things "oddly" sometimes and that there was nothing TAMU could do about it.

66.     Upon receiving this letter, John Doe was extremely confused, as he had not heard of any allegations or claims by Jane Doe, and had had purely pleasant and casual communications with her preceding the issuance of the no-contact directive. John Doe was also troubled by the fact that such damning information had been spread to fellow students, teachers, and acquaintances. Nevertheless, John Doe made sure to comply with the instructions in the letter.

67.     In or about February 2017, John Doe was informed by several fellow students and members of the Corps of Cadet that Jane Doe was telling people detailed information relating to

the complaint she made against John Doe, as well as false information in order to vilify and defame John Doe. Upon learning of Jane Doe's conduct, John Doe immediately called the Student Conduct Office and alerted them of this information, and explaining that it was John Doe's understanding that the directive to refrain from discussing the matter with third parties applied to both John Doe and Jane Doe. The Student Conduct Office, however, informed John Doe that there was nothing they could do and that John Doe would just have to hope that Jane Doe stopped spreading the false information soon. The University failed to take any action to protect John Doe's right to confidentiality and privacy to "as great a degree as is legally possible," as afforded to TAMU students – including alleged offenders of misconduct – by its Policy. The University also failed to take any actions with regard to Jane Doe's defamatory campaign against John Doe.

68.     On February 23, 2017, John Doe and his advisor/attorney, Michelle Simpson Tuegel, met with the University's Title IX Investigator, Robin Shuglie as well as Lieutenant Colonel Dale Norris. John Doe was informed that Ms. Shuglie and Lt. Col. Norris wanted to interview him. However, as John Doe was still unaware of the specifics of the allegations against him, he asked that he be provided more detailed information about the allegations prior to an interview, in accordance with the Policy, which states that "[t]imely access to any information that will be used during formal and informal disciplinary meetings/hearings will be provided to the accuser, accused, and appropriate officials." Despite being read a list of the questions TAMU planned to ask him, no specifics of the allegations against him were communicated.

69.     John Doe was particularly concerned that Lt. Col. Norris made it clear he knew Jane Doe well, referring to her by her first name, and even correcting Ms. Shuglie on the

pronunciation of Jane Doe's name. Lt. Col. Norris knew Jane Doe through Air Force ROTC, which Lt. Col. Norris has a part in overseeing.

70.     Later that same day, John Doe received an email from Ms. Shuglie, providing him with a document titled "Resources, Rights, and Options for Individuals Accused of Sexual Harassment, Sexual Misconduct, Stalking, Domestic Violence or Dating Violence." It was from reading that document that John Doe was informed of the nature of the allegations against him. However, as he still had not received any information regarding the specific allegations being claimed against him, John Doe informed Ms. Shuglie that he could not provide any information or statements at that time and would like to be advised as to the next step in the process.

71.     Approximately one month later, on the afternoon of March 22, 2017, John Doe was emailed a letter listing Jane Doe's allegations against him. The document further informed him that he was required to appear for two meetings: "(1) a Student Life Conduct Conference Information Session and (2) a Student Life Conduct Conference Panel." The first Student Life Conduct Conference Information Session (the "Information Session") was scheduled for less than two days later, on the morning of March 24, 2017. The Student Life Conduct Conference Panel (the "Panel") was scheduled for March 30, 2017. However, the Policy provides that "[d]uring the student conduct process the accused and accuser have timely notice of meetings at which the accuser or accused, or both, may be present."

72.     With less than two days' notice given for the Information Session, John Doe's advisor would be unable to attend. The Information Session was to be a meeting wherein John Doe and his advisor would have the opportunity to review the charges pending and applicable sections of the University various rules and codes, as well as sanctions John Doe may be facing, as well as their opportunity to ask any questions regarding the student conduct process.

73.     It was clear to John Doe that the Information Session was an important part of the process, and as it was asserted in the March 22, 2017 letter that it was a "University expectation that [John Doe] appear" for both the Information Session and the Panel. Because of the seriousness of the situation, and in order to obtain more time to review the case file and prepare with his advisor, John Doe promptly called to request that the Information Session be moved a few days to March 28, 2017, and the Hearing to April 5, 2017. He was told that they would not move either date based on an advisor's schedule but that someone handling the case would call him back that same day or the next in order to discuss further.

74.     Later that day, John Doe received a call from Dayna Ford, Assistant Director for the Division of Student Affairs, who instructed John Doe to email her the request for the dates to be moved as well as the underlying reason for the request. She warned him that because of their current case load and availability, they do not have any other dates to offer him that would fall within the 60-day window required, and they would therefore need to ask for an extension which may or may not be granted.

75.     John Doe complied with Ms. Ford's instructions and emailed her with the date requests, explaining that the underlying reason for the requests was so he could have the proper amount of time to review his case file and prepare with his advisor before the Information Session and the Panel. He further explained that the extra few days would allow him to juggle the process with the exams and quizzes he had throughout the upcoming week.

76.     Ms. Ford responded to John Doe, informing him that his request was denied. As one basis for the denial, Ms. Ford stated that Student Rule 26 requires the University "to provide students with 3 University business days to prepare for their conference" and that based on the

notice they provided to John Doe the previous day, the University has provided John Doe with "more than 3 University business days notice."

77.     However, Student Rule 26 of the Policy states broadly: "The accused student will be given at least three (3) University business days to prepare for **a conference**." (emphasis added). The Student Life Conduct Conference Information Session, a conference of great importance to both the University and John Doe was scheduled for less than two days after notice was given, thereby depriving John Doe of the necessary time to prepare for the conference.

### D. John Doe Is Hospitalized And Undergoes Treatment For Depression; TAMU Refuses To Hold Proceedings Until John Doe's Release

78.     On the evening of March 22, 2017, John Doe, who had a history of depression, became suicidal and sought help from an on-campus clinic. The next morning, John Doe's father let Attorney Tuegel know that John Doe was being admitted to a hospital.

79.     Attorney Tuegel wrote to Ms. Ford on March 23, 2017, informing them that John Doe was being treated at a hospital and was unable to attend school, work, or community activities until further notice. She also informed them that he would not be able to be present for his meeting due to his "current medical situation/ongoing treatment." Attorney Tuegel provided documentation from the hospital indicating the same. Attorney Tuegel inquired whether Jon Doe's Information Session and Panel could be put on hold until he was released from medical treatment.

80.     Ms. Ford responded to Attorney Tuegel to let her know that typically in situations where a student is hospitalized shortly before their conduct conference, they (the Office of the Dean of Student Life) "submit an extension request to complete the case at a later date" and will "work with the student upon release to get something scheduled in a timely manner."

81.     Several days later, on March 31, 2017, Attorney Tuegel informed Ms. Ford that John Doe was released from the hospital that day, but that his doctors recommended that John Doe continue intensive treatment for his depression and therefore had been admitted to another treatment hospital for a 45-day in-patient program. She further informed Ms. Ford that John Doe's doctors recommended he not continue with school or work for the remainder of the semester, and therefore John Doe had withdrawn from TAMU for the time being. Attorney Tuegel attached to her email the appropriate and relevant documentations regarding John Doe's new treatment facility.

82.     Despite being informed that John Doe would be in the hospital for a 45-day intensive treatment program, Ms. Ford emailed Attorney Tuegel on April 11, 2017 to inform her that John Doe's Information Session had been scheduled for two days later on April 13, 2017, and his Panel had been scheduled to proceed on April 20, 2017.

83.     As John Doe would still be in the beginning and middle of his intensive treatment program during the dates scheduled, it was impossible for John Doe to be able to proceed on those dates and meaningfully defend himself against the allegations. Therefore, Attorney Tuegel responded to Ms. Ford to inform her that due to John Doe's ongoing treatment, the scheduled dates would deprive John Doe of the opportunity to attend the Panel in person with his advisor.

84.     On April 17, 2017, Attorney Tuegel sent a formal letter to Ms. Ford, explaining John Doe's inability to meaningfully participate or be present for his Information Session, a file review, and Panel on the dates provided by the University. Attorney Tuegel noted that proceeding without John Doe would prejudice John Doe and make it impossible for the University to reach a fair and impartial result of the disciplinary process. She also reiterated John Doe's formal request that the dates be rescheduled to a time after his projected release from the

24

hospital, as well as a repeated request for Attorney Tuegel to review the full investigative file without John Doe's presence, a request that had previously been ignored. Additionally, Attorney Tuegel provided a letter from John Doe's doctor, explaining that John Doe was admitted to the new treatment center on April 1, 2017 with a projected discharge date of May 15, 2017.

85.    Moreover, Attorney Tuegel informed the University in her April 17, 2017 letter that John Doe and his family were being informed that Jane Doe was intentionally and unnecessarily discussing the details of the disciplinary matter with numerous fellow TAMU students, in a retaliatory manner. Jane Doe's communication of private information regarding the matter was being shared with the intention of harming John Doe. As a result of Jane Doe's retaliation, as Attorney Tuegel explained, John Doe has been deprived of the ability to participate in the academic environment and process at the University.

86.    Ms. Ford responded to Attorney Tuegel that the Information Session and Panel was rescheduled for April 27, 2017 and May 2, 2017, respectively. These newly rescheduled dates were both prior to the projected discharge date as communicated by John Doe's doctor. Attorney Tuegel explained this issue to Ms. Ford, again referencing the letter provided by John Doe's doctor.

87.    In response, Ms. Ford wrote "We will be proceeding with [John Doe's] case on May 2, 2017. He is able to participate if he chooses, and we can facilitate his participation in both the Information Session and the Panel via distance." However, as John Doe was undergoing intense in-patient treatment for depression, participation in the Information Session and Panel, even remotely, was not a possibility and against the recommendation of John Doe's doctors.

88.    TAMU's insistence to proceed with the investigation and adjudication process without John Doe's participation was in direct contradiction to the Policy, which provides "The

25

investigative authority, composed of one or more people, will review the complaint, interview the accuser, the accused, and witnesses, if applicable, and ascertain details and circumstances associated with the complaint." However, TAMU decided to proceed with the process without ever once interviewing the accused, John Doe.

89.     Additionally, the Policy states that while the University's goal is to resolve complaints in a reasonably prompt timeframe of approximately 55 business days excluding any appeal period, "extenuating circumstances requiring additional time may necessitate an extension with good cause." It stood to reason that a hospitalization and 45 day treatment program would constitute "extenuating circumstances" and "good cause."

90.     On April 26, 2017, John Doe's father received a call at his home from TAMU's Dean of Student Life, Anne Reber, explaining that she was looking for John Doe. John Doe's father informed her that John Doe does not have access to a computer or cell phone while in the treatment facility. She informed John Doe's father that John Doe was on her list to appear at a meeting the following day, to which John Doe's father again explained that John Doe was in a treatment center and that a doctor had already sent a letter informing the University of John Doe's projected discharge date. However, she claimed to be unaware of the communications John Doe's father referenced, but that she would "take note of it."

91.     A day or two after the April 26th call, the office of the Dean of Student Life called again with the same request to speak with John Doe about his case, to which John Doe's father again reiterated the same information about John Doe's availability, his status at the mental health facility, and the fact that he did not have access to modes of communication while in the facility.

92.     Thereafter, neither Attorney Tuegel nor John Doe's parents receive any communication from Ms. Ford or other University representative regarding John Doe's disciplinary proceedings, despite having received a FERPA release and previously communicating with Attorney Tuegel regarding the disciplinary proceedings.

### E.  TAMU Conducts Hearing Panel While John Doe Continues Medical Treatment; Finds John Doe "Responsible" On All Charges

93.     On May 9, 2017, while still in the midst of receiving intensive treatment at a medical facility, John Doe was given brief access to a computer, while accompanied by his therapist, for the first time since being admitted for treatment.

94.     While checking his emails, he discovered that the University had emailed him a letter listing the University's determination of the charges against him (the "Decision Letter"). The University found him "Responsible" for all four charges[3]: (1) Sexual Contact; (2) Sexual Abuse; (3) Dating Violence; and (4) Violation of the Standard: Conduct Unbecoming a Cadet (the "Decision").

95.     The Decision Letter began by stating "You are suspended from Texas A&M University." The shock and distress resulted by the bluntness of the letter, which was sent without warning, detrimentally affected the progress John Doe had made in this treatment for depression.

96.     Because it was not sent to John Doe's parents or advisor as well (who had all been listed on the FERPA release allowing them access to communications regarding the disciplinary proceedings), John Doe was unaware of the Decision for six days after it was emailed to him. It

---

[3] While John Doe was not found "Responsible" for each individual act of misconduct alleged against him by Jane Doe, he was found "Responsible" for one or more alleged acts of misconduct within each charge, thereby deeming him "Responsible" on all four charges.

also prevented John Doe from having the immediate support and guidance from his parents and advisor immediately upon facing such devastating news.

97.     The Decision Letter went on to describe the severe sanctions placed on John Doe:

a.  John Doe was suspended from the University, effective starting May 1, 2017 (one day prior to the Panel was convened and Decision was determined) until August 10, 2018;

b.  In order to continue his education at TAMU, John Doe must re-apply to the University and meet all University criteria and deadlines for re-enrollment and/or re-application as outlined in the Undergraduate and Graduate Catalog;

c.  John Doe was dismissed for the Corps of Cadet;

d.  John Doe would be placed on Conduct Probation upon re-enrollment to TAMU, which would remain in effect through his graduation;

e.  Upon re-enrollment to TAMU, John Doe will be required to attend the Alcohol Education Workshop through the Health Promotion Office;

f.  Upon re-enrollment to TAMU, John Doe will be referred to the Student Counseling Service to complete an alcohol assessment;

g.  Upon re-enrollment to TAMU, John Doe will be required to attend the University administered Ethics & Decision Making workshop;

h.  Upon re-enrollment to TAMU, John Doe will be required to schedule and attend a meeting with a Consensual, Language, Education, Awareness, and Relationships Office state member; and

      i.   John Doe will be permanently restricted from any contact with Jane Doe and may never appear at a location where he knows or reasonably should know that Jane Doe would be present. (Collectively, the "Sanctions")

98.    The Decision Letter also stated that the Decision was made during the May 2, 2017 Panel where Ms. Ford, Mike Dulke, Kyle McCracken, Terri Allison, and Joshua Isringhausen were the sole participants present. Jane Doe did not attend or participate in the Panel and did not provide an impact statement. The Decision was based solely on her prior interview. Neither John Doe nor Attorney Tuegel were given the access to TAMU's file or the opportunity to submit a personal statement and/or questions for Jane Doe.

99.    The rationale for the Decision as stated in the Decision Letter was as follows: "[John Doe] was found responsible for somewhat serious charges, which the panel feels warrants a separation from the university in the form of a suspension to be necessary."

100.    The Decision Letter also stated: "Although the complainant did not participate nor provide an impact statement, she did state that she was in fear during the incident that occurred in June 2016, and that she wanted as little of him in her life as possible. A suspension through August 2018, should ensure that the complainant has graduated, and along with the no contact order make sure that she does not come in contact with [John Doe]."

101.    The Decision Letter was silent as to any witness testimony provided, the investigation conducted into the veracity of the allegations, or the presence/lack of any relevant evidence. Instead, the Decision was based solely on Jane Doe's word, provided prior to the Panel, and without input from John Doe who was in a treatment facility and unable to participate in the Panel or provide his position and defense.

102.    The Decision Letter concluded by directing John Doe that he may appeal the Decision by 5 p.m. on May 9, 2017. Because John Doe was unaware that a Decision had been emailed to him until he checked his email on May 9, 2017, he was unable to submit a timely appeal of the Decision.

**F.   TAMU's Inherent Bias Towards Male Complainants and Respondents**

103.    Around the time that Jane Doe's allegations against John Doe were being adjudicated, a fellow TAMU student "R.P." filed a sexual misconduct complaint against Jane Doe. In fact, R.P.'s claim was made directly to TAMU when he was called in to speak as a witness to Jane Doe's claims. It is then that R.P. reported to TAMU that Jane Doe had sexually assaulted him the weekend prior to making her report for misconduct against John Doe.

104.    Upon information and belief, R.P.'s claims against Jane Doe alleged that Jane Doe initiated and performed sexual acts on R.P., while R.P. was intoxicated to the point where he had no control over his body and movements, lacked balance and stability, and his speech and was impaired. Despite his extreme stated of intoxication, R.P allegedly told Jane Doe he did not want to have any intimate or sexual contact with her, but she ignored his protests and proceeded to engage in non-consensual sexual activity with R.P.

105.    Upon information and belief, when R.P. made his complaint against Jane Doe and alerted the University of his allegations, the University did not treat Jane Doe as a predator as they had treated John Doe. She was able to continue with all of her academic and extracurricular activities, continue to live in her dormitory.

106.    Conversely, John Doe was forced to stop attending his extracurricular activities, including Corps of Cadet and the Aggie Band, because Jane Doe would be in attendance and the no-contact order directed that John Doe abstain from attending those activities. John Doe was

also removed from his dormitory once Jane Doe filed her complaint with the University. John Doe had been advised at the time that such measures were commonplace and standard protocol when such an investigation is undertaken. However, no such measures were taken when a complaint was made against Jane Doe by a fellow student.

107.    Upon information and belief, the University failed to interview any witnesses regarding R.P.'s claim against Jane Doe, and simply asked R.P. a few questions about his allegations when he made them. R.P. also sent the University screen shots of the text messages he sent Jane Doe after the alleged assault, telling her that he was upset because he had not consented, and she agreed with him.

108.    Upon information and belief, Lt. Col. Norris called R.P. and bullied him into answering more questions about his complaint against Jane Doe, telling R.P that if he did not answer the questions right away, he would turn it into a long drawn-out process.

109.    Upon information and belief, after R.P. made his complaint against Jane Doe, he was unaware of whether an investigation was underway, because he did not hear anything further from the University regarding statements or witness testimony, and because Jane Doe had not been barred from her dormitory or extracurricular activities as John Doe had been. R.P. was only made aware of an ongoing investigation into his claims when he received correspondence from the University, informing him of a scheduled hearing.

110.    R.P. attended the hearing. Despite R.P.'s detailed allegations and text messages between him and Jane Doe, the University found Jane Doe "Not Responsible" for any misconduct. Upon information and belief, the University's decision was based on a finding of 50/50 responsibility, meaning that the University found both parties held equal responsibility in

their sexual conduct and no sanctions were imposed. The University allegedly informed the parties that the decision was based on an alleged lack of evidence.

111.    However, although there was no evidence to corroborate Jane Doe's allegations against John Doe (and no evidence was referenced or discussed in the Decision Letter), the University decided that John Doe was Responsible and should be imposed severe Sanctions that included suspension and dismissal from the Corps of Cadet.

112.    In their treatment and determination of both Jane Doe's complaint against John Doe and R.P.'s complaint against Jane Doe, TAMU has demonstrated its application of policies is inherently biased against male students. A female and male both accused of sexual misconduct received dramatically different treatments and outcomes by the University.

113.    In sum, like all respondents at TAMU, who are habitually male, John Doe's rights to fair process were violated by the application of a discriminatory sexual misconduct policy which denied him the right to a fair and impartial hearing, subjected him to double jeopardy, and resulted in an extreme and unwarranted sanction.

## COUNT I
### (42 U.S.C. § 1983: Denial of Fourteenth Amendment Due Process Against Defendant TAMU)

114.    John Doe repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

115.    The Fourteenth Amendment to the United States Constitution provides that no state shall "deprive any person of life, liberty, or property, without due process of law."  In this case, Defendants are state actors subject to the Fourteenth Amendment.

116.    Section 1983 of Title 42 of the U.S. Code provides in pertinent part:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to

be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . . .

117. A person has a protected liberty interest in his good name, reputation, honor, and integrity, of which he cannot be deprived without due process.

118. On April 4, 2011, the United States, by and through its agent the United States Department of Education, sent a 19-page "Dear Colleague" letter to colleges and universities all over the country, stating that "sexual violence" on campus was a form of "sexual harassment prohibited by Title IX" ("Dear Colleague Letter").

119. Reversing previous federal policy, the Dear Colleague Letter threatened colleges with hundreds of millions of dollars in de-funding penalties if they did not immediately begin investigating and adjudicating allegations of campus sexual assault under detailed procedures and terms dictated by the federal government.

120. For example, and without limitation, as a result of the Dear Colleague Letter and later statements, actions, and directives issued by the United States, colleges were as of 2016:

(i)     Required to investigate and adjudicate campus sexual assault allegations regardless of whether the complainant reported his or her allegations to the police (whereas previous federal policy had permitted colleges to allow law enforcement to handle allegations of sexual assault);

(ii)    Required to establish a coordinated and centralized investigative and adjudicative procedure according to detailed rules mandated by the federal government and headed by a Title IX coordinator;

(iii)   Required to protect the anonymity of students accusing another student of sexual assault if the student making the allegations so requests;

(iv)    Required to apply a preponderance of the evidence standard when adjudicating such allegations (whereas previously colleges frequently applied higher evidentiary standards, such as the clear and convincing evidence standard);

(v)     Required not to allow cross-examination by the accused student;

33

(vi)     Required or strongly encouraged to expel students that the college finds to have engaged in unconsented-to sexual intercourse with another student.

121.     Since 2011, the United States has consistently reaffirmed and adhered to the threat of substantial monetary penalties made in the Dear Colleague Letter.  For example, in July 2014, former DOE Assistant Secretary for Civil Rights, Catherine Lhamon, stated that she would strip federal funding from any college found to be non-compliant with the requirements of the Dear Colleague Letter. "Do not think it's an empty threat," Lhamon warned.

122.     Upon information and belief, since 2011, TAMU has acted in response to the federal government's threat that colleges refusing to comply would be found in violation of Title IX and be subject to extremely substantial, and in fact crippling, monetary penalties. Therefore, TAMU has a pecuniary interest in the outcome of the adjudication of sexual assault complaints, because it could lose federal money if it finds the respondent "Not Responsible." TAMU does not face the same risk of pecuniary loss if it finds the respondent "Responsible."

123.     Indeed, demonstrating its attempted compliance with the 2011 Dear Colleague Letter, TAMU's Clery Reports reveal that the number of forcible sex offenses reported at TAMU increased considerably from 15 reported instances in 2013, to 19 reports in 2014, and 37 reported incidents in 2015.

124.     Notably, the OCR opened an investigation at TAMU in 2015, after a graduate student accused of sexual assault, found responsible, and suspended by the institution objected to what he saw as a "flawed" system. Upon information and belief, as part of their investigation, the OCR asked TAMU to respond to allegations that it showed bias against men during its disciplinary proceedings. At the time the OCR investigation was announced, TAMU reportedly defended the suspension, saying it was "based on careful consideration of the testimony of the

parties    and    relevant    witnesses    and    a    review    of    written    evidence."
https://www.texastribune.org/2015/11/17/department-education-investigating-texas-schools/

125.    The Dear Colleague Letter has resulted in significant action and legal consequences.  Former Assistant Secretary for the Office of Civil Rights Catherine Lhamon recognized that: "Our release of the 2011 DCL is widely credited with having sparked significant changes at colleges and universities as they worked to meet Title IX's requirements consistent with the 2011 DCL."

126.    Speaking at a conference on campus sexual assault held at Dartmouth College in July 2014, Lhamon also stated that despite the fact it had never been done before, she was prepared to cut off federal funding to schools that violate Title IX.  She went on to describe that enforcement mechanism as part of a set of "very, very effective tools."  Lhamon said, "If a school refuses to comply with Title IX in any respect, I will enforce."

127.    In fact, former Secretary Lhamon admitted: "It's nice when you carry the big stick of the federal government."  Concerning why there is a higher volume of complaints being made to the OCR, Lhamon stated: "I think there is more public awareness about the issue and also more confidence from survivors that we will be there for them." http://www.si.com/college-football/2016/10/20/title-ix-sexual-assault-explained

128.    Accordingly, TAMU was coerced by the United States into complying with the Title IX investigative and adjudicatory process mandated by the Dear Colleague Letter and by subsequent federal actions, statements, and directives.

129.    TAMU applied the investigative and adjudicatory process dictated to it by the federal government when it investigated and adjudicated the sexual assault complaints against John Doe.

130.     Accordingly, when TAMU investigated and adjudicated the sexual misconduct complaints against John Doe, and imposed a sanction of suspension on John Doe upon reaching its conclusions, TAMU was a state actor and was therefore required to honor the rights and guarantees set forth in the United States Constitution.

131.     In the course of such investigation and adjudication, TAMU flagrantly violated Plaintiff's clearly established rights under the Due Process Clause of the Fourteenth Amendment through its repeated acts of gender bias and of deprivation of the minimal requirements of procedural fairness.

132.     Defendant TAMU deprived Plaintiff of his liberty and property interests without affording him basic due process, including, but not limited to: his right to a fair adjudication; his right to be informed of the exact charges against him; his right to be heard by an impartial fact finder; his right to question his accuser; his right to challenge the credibility of any adverse witnesses; and his right to present evidence and witnesses in support of his defense.

133.     As a result, Defendant TAMU failed to provide Plaintiff with the basic due process protections that they are required to provide to students accused of sexual misconduct, in violation of the 14th Amendment.

134.     Based on the foregoing, TAMU was a state actor when it violated the rights and guarantees set forth in the Fourteenth Amendment of the United States Constitution during the investigation and adjudication of the complaints against John Doe.

135.     As a result of these due process violations, Plaintiff continues to suffer ongoing harm, including damages to his reputation and other non-economic and economic damages.

136.     Accordingly, Defendant TAMU is liable to Plaintiff for violations of the Due Process Clause of the Fourteenth Amendment, and for all damages arising therefrom.

137.    As a direct and proximate result of the above conduct, Plaintiff sustained tremendous damages, including, without limitation, emotional distress, loss of educational and career opportunities, reputational damages, economic injuries and other direct and consequential damages.

138.    As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

### COUNT II
### (Violation of Title IX of the Education Amendments of 1972 Against All Defendants)

139.    John Doe repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

140.    Title IX of the Education Amendments of 1972 provides, in relevant part, that:

> No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

141.    Title IX of the Education Amendments of 1972 applies to an entire school or institution if any part of that school receives federal funds; hence, athletic programs are subject to Title IX of the Education Amendments of 1972 even though there is very little direct federal funding of school sports.

142.    It was reported in 2015 that the Texas A&M University System ("A&M") was allocated about one-third of the funding appropriated to higher education through two House Bills during the 84th State Legislative Session. Billy Hamilton, the CFO of A&M, said at the time that A&M was appropriated $2.3 billion with the main campus receiving $650 million. A&M agencies were appropriated $913.9 million. Additionally, a research fund for the in excess of $140 million was created to benefit A&M and the University of Texas. Reportedly, House Bill 1000 alone established the $147,075,793 Texas Research University Fund, available exclusively

to A&M and the University of Texas. It was further reported that the state of Texas would contribute $1 million into the fund for every $10 million that A&M and the University of Texas gets in Federal and private grants. (See http://fortbendags.com/index.php/2015/07/23/texas-am-scores-major-financial-victory-in-84th-state-legislative-session/)

143.    Title IX may be violated by a school's failure to prevent or remedy sexual harassment or sexual assault or by the imposition of university discipline where gender is a motivating factor in the decision to discipline.  In either case, the statute is enforceable through an implied private right of action.

144.    The Obama Administration's DOE promulgated regulations under Title IX that require a school to "adopt and publish grievance procedures providing for the prompt and equitable resolution of student . . . complaints alleging any action which would be prohibited by" Title IX or regulations thereunder. Such prohibited actions include all forms of sexual misconduct. 34 C.F.R. § 106.8(b).

145.    Even the Obama Administration's DOE ostensibly recognized that the procedures adopted by a school such as Defendant TAMU covered by Title IX must accord due process to both parties involved. The practical reason why due process matters is so that cases are not decided "on the basis of an erroneous or distorted conception of the law or the facts." *Marshall v. Jerrico, Inc.*, 446 U.S. 238, 242 (1980).

146.    The Obama Administration's DOE recognized that there must be "[a]dequate, reliable, and impartial investigation of complaints" and that a school has an obligation under Title IX to make sure that all employees involved in the conduct of the procedures have "adequate training as to what conduct constitutes sexual harassment, which includes "alleged sexual assaults."

38

147. Challenges to university disciplinary proceedings for sex discrimination generally fall into two categories: (1) "erroneous outcome" cases, in which the claim is that plaintiff was innocent and wrongly found to have committed an offense and gender bias was a motivating factor behind the erroneous findings; and (2) "severity of penalty/selective initiation" cases, in which the claim generally asserts that, regardless of the student's guilt or innocence, the severity of the penalty and/or decision to initiate the proceeding was affected by the student's gender.

148. An "erroneous outcome" occurred in this case because John Doe was innocent and wrongly found to have committed sexual assault, and gender bias was a motivating factor.

149. The denial of due process and the procedural errors made in this case resulted in an "erroneous outcome" based on a flawed and distorted conception of the facts.

150. Defendant TAMU failed to conduct an adequate, reliable, and impartial investigation when it conducted its investigation and hearing into Jane Doe's allegations, without John Doe's participation due to his ongoing medical treatments. The subsequent investigation and adjudication were further conducted in a manner that was biased against John Doe. The investigators and adjudicator were further biased by the University's erroneous conclusion that John Doe had engaged in misconduct, despite a lack of evidence or witness testimony to support Jane Doe's claims.

151. TAMU's treatment of John Doe's case also indicated that its policies and procedures are inherently biased against male students, when it investigated and adjudicated allegations against John Doe in a manner and degree materially different than their investigation and adjudications of allegations made against Jane Doe by a male student.

152. Cross-examination has been recognized as the greatest legal engine ever invented for discovery of the truth, *Lilly v. Virginia*, 527 U.S. 116, 124 (1999), and has been ruled to be

required for basic due process in campus disciplinary cases, *Donohue v. Baker*, 976 F. Supp. 136 (N.D.N.Y. 1997). Yet, in a case where Defendant TAMU relied only on the statements made by Jane Doe *prior to* the Panel, a hearing wherein Jane Doe was absent and John Doe was unable to attend due to his medical treatment, no cross-examination was available and no sworn testimony was taken, in violation of due process of law. *John Doe v. University of Cincinnati*, No. 16-cv-987, 2016 WL 6996194 (S.D. Ohio Nov. 30, 2016).

153.    The totality of the circumstances establishes that Defendants acted out of gender bias in reaching the "erroneous outcome." Defendants attempted to question John Doe about the allegations before informing John Doe of what was being alleged against him. Defendants barred John Doe from participating in the investigation and adjudication process, as the Defendants refused to acknowledge or work around John Doe's medical treatment, despite being informed of his projected hospital discharge date on multiple occasions. From the moment Jane Doe reported her allegations to the University, Defendants barred John Doe from attending his extracurricular activities or continue living in his dormitory, separating him from his support system. Defendants found John Doe "Responsible" for all four claims alleged against him and imposed on him unduly harsh and unreasonable Sanction, despite a lack of evidence, lack of witness testimony, and lack of participation by both Jane Doe and John Doe at the Panel.

154.    Upon information and belief, Defendants were pressured by a campus activist group that was calling for harsher penalties for respondents in Title IX cases, a student complaint filed with OCR, and a pending OCR investigation that was commenced before the complaints were alleged against John Doe. The Obama Administration's Department of Education pressured colleges and universities into following the Title IX investigative and adjudicatory process mandated by the 2011 Dear Colleague Letter regardless of due process considerations.

Upon information and belief, Defendant TAMU's mishandling of John Doe's case was wrongfully affected by campus and federal pressure.

155.    The totality of circumstances establishes that Defendant TAMU has demonstrated a pattern of inherent and systematic gender bias and discrimination against male students accused of misconduct.

156.    Upon information and belief, all students that have been suspended or expelled from Defendant TAMU for sexual misconduct have been male.

157.    Male respondents in sexual misconduct cases at Defendant TAMU are discriminated against solely on the basis of sex.  They are invariably found guilty, regardless of the evidence or lack thereof.

158.    As a direct and proximate result of the above conduct, John Doe sustained tremendous damages, including, without limitation, emotional distress, loss of educational, athletic and career opportunities, economic injuries and other direct and consequential damages.

159.    As a result of the foregoing, John Doe is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, and to an injunction enjoining violations of the Title IX in the process of investigating and adjudicating sexual misconduct complaints.

## COUNT III
### (State Law Breach of Contract against Defendant TAMU)

160.    John Doe repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

161.    Defendant TAMU created express and/or implied contracts when John Doe accepted an offer of admission to Defendant TAMU and paid the tuition and fees.

162.    Defendant TAMU breached express and/or implied contracts with John Doe.

163.    Defendant TAMU's policies provide that students are to have a fair and impartial disciplinary process in which it is the responsibility of the University to show that a violation has occurred before any sanctions are imposed.  Defendant TAMU breached its contract with John Doe when it failed to conduct a fair and impartial process, including not holding a hearing in which John Doe could meaningfully participate.   At no time was John Doe afforded the procedural guarantees that generally accompany a hearing, such as the right to present witnesses and evidence, confront one's accuser, and cross-examine and challenge any witnesses against him, all before an impartial and objective fact-finder.  Thus, Defendants violated the contract with John Doe when they failed to afford him a proper hearing on the accusations against him.

164.    The U.S. Department of Education Office for Civil Rights requires that the excessively low preponderance of the evidence burden of proof be used to evaluate allegations of sexual misconduct.  Though an inadequate standard to protect the procedural rights of accused students, Defendant TAMU utilizes this standard of review, as recognized in its Policy. Defendant TAMU violated this provision when it improperly placed the burden of proof on John Doe to prove that the accusations against him were not true and when it failed to utilize the preponderance of the evidence standard in fact in reaching the outcome.  Defendant TAMU therefore breached its contract with John Doe when it failed to utilize the requisite preponderance of the evidence standard.

165.    Based on the aforementioned facts and circumstances, Defendant TAMU breached and violated a covenant of good faith and fair dealing implied in the agreement(s) with John Doe.  Defendant TAMU failed its duty of good faith and fair dealing when it meted out a disproportionate sanction notwithstanding the flawed process and lack of evidence in support of the allegations of sexual misconduct.

166.     John Doe is entitled to recover damages for Defendant TAMU's breach of the express and/or implied contractual obligations described above.  As a direct and proximate result of the above conduct, John Doe sustained tremendous damages, including, without limitation, emotional distress, loss of educational and career opportunities, economic injuries and other direct and consequential damages.

167.     As a result of the foregoing, John Doe is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

**COUNT IV**
**(State Law Estoppel and Reliance against Defendant TAMU)**

168.     John Doe repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

169.     Defendant TAMU's various policies constitute representations and promises that Defendant TAMU should have reasonably expected to induce action or forbearance by John Doe.

170.     Defendant TAMU expected or should have expected John Doe to accept its offer of admission, incur tuition and fees expenses, and choose not to attend other colleges based on its express and implied promises that Defendant TAMU would not tolerate, and John Doe would not suffer, harassment by fellow students and would not deny John Doe his procedural rights should he be accused of a violation of TAMU policies.

171.     John Doe relied to his detriment on these express and implied promises and representations made by Defendant TAMU.

172.     Based on the foregoing, Defendant TAMU is liable to John Doe based on estoppel.

173.    As a direct and proximate result of the above conduct, John Doe sustained tremendous damages, including, without limitation, emotional distress, psychological damages, loss of educational and athletic opportunities, economic injuries and other direct and consequential damages.

**COUNT V**
**Negligent Infliction of Emotional Distress**

174.    John Doe repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

175.    TAMU owed duties of care to John Doe. Such duties included, without limitation, a duty of reasonable care in conducting the investigation of the allegations against him in a fair and impartial manner. TAMU breached its duties owed to John Doe.

176.    Such breach by TAMU created an unreasonable risk of causing John Doe emotional distress in that John Doe's academic and disciplinary record is irrevocably and irreversibly tarnished.

177.    TAMU was informed that its student, Jane Doe, had spread false defamatory information and private information regarding the allegations, investigation, and adjudication process. Despite this, TAMU failed to protect John Doe's right to confidentiality and privacy to "as great a degree as is legally possible," as afforded to TAMU students – including alleged offenders of misconduct – by its Policy.

178.    As a direct and foreseeable consequence of TAMU's actions, John Doe sustained tremendous damages, including, without limitation, severe emotional distress, loss of educational and career opportunities, economic injuries, and other direct and consequential damages.

179.    The emotional distress was severe enough that it has resulted in illness and/or mental harm to John Doe, namely, John Doe's increased anxiety, suicidal thoughts, depression,

paranoia, and extreme insomnia, resulting in John Doe's need for medical treatment at a mental health facility.

180.    TAMU's extreme and outrageous conduct was the cause of John Doe's distress.

181.    Considering that John Doe's entire academic and future employment opportunities would suffer as a result of the adverse decision, TAMU should have recognized that its conduct involved an unreasonable risk of causing emotional distress and that that distress, if it were caused, might result in illness or harm.

182.    John Doe's distress is reasonable in light of TAMU's conduct.

183.    As a direct and proximate result of the above conduct, John Doe sustained tremendous damages, including, without limitation, emotional distress, psychological damages, loss of educational and athletic opportunities, economic injuries and other direct and consequential damages.

## **PRAYER FOR RELIEF**

**WHEREFORE,** for the foregoing reasons, John Doe demands judgment against Defendants as follows:

(i)     on the first cause of action for violation of constitutional due process under 42 U.S.C. § 1983, a judgment against Defendants awarding John Doe damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and athletic opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements an injunction  enjoining violations of the Fourteenth Amendment in the process of investigating and adjudicating sexual misconduct complaints;

(ii)    on the second cause of action for violation of Title IX of the Education Amendments of 1972, a judgment against Defendants awarding John Doe damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and athletic opportunities, loss of future career prospects, and punitive damages, plus

prejudgment interest, attorneys' fees, expenses, costs and disbursements and an injunction against and to an injunction enjoining violations of the Title IX in the process of investigating and adjudicating sexual misconduct complaints;

(iii)    on the third cause of action for state law breach of contract, a judgment awarding John Doe damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and athletic opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(iv)    on the fourth cause of action for state law breach estoppel and reliance, a judgment awarding John Doe damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and athletic opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(v)    on the fifth cause of action for state law negligent infliction of emotional distress, a judgment awarding John Doe damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and athletic opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(vi)    awarding John Doe such other and further relief as the Court deems just, equitable and proper.

## JURY DEMAND

Plaintiff demands a trial by jury of all issues presented herein that are capable of being tried by a jury.

**Dated: August 15, 2017**

                         Respectfully submitted,

                              /s/ Michelle Simpson Tuegel
                         Michelle Simpson Tuegel, Esq..
                         HUNT & TUEGEL, PLLC
                         P.O. Box 726
                         Waco, Texas 76703
                         ALICO Building, Suite 1208
                         425 Austin Avenue

46

Waco, Texas 76701
(254) 753-3738
Email: michellecriminaldefense@gmail.com


**-and-**


_____/s/ Andrew T. Miltenberg_____

Andrew T. Miltenberg, Esq. (*pro hac vice* pending)

Diana R. Warshow, Esq. (*pro hac vice* pending)

NESENOFF & MILTENBERG, LLP

363 Seventh Avenue, Fifth Floor

New York, New York 10001

(212) 736-4500

Email: Amiltenberg@nmllplaw.com

**ATTORNEYS FOR PLAINTIFF JOHN DOE**